**SARAH HEATON CONCANNON**
**(SDNY Bar No. SC-9111)**
**Attorney for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**100 F Street, N.E.**
**Washington, D.C. 20549**
**(202) 551-5361**
**ConcannonS@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**SEQUENTIAL BRANDS GROUP, INC.**<br><br>**Defendant.** | **COMPLAINT**<br><br>**Civil Action No. 20-CV-10471**<br><br>**JURY TRIAL DEMANDED**<br><br>**ECF CASE** |

Plaintiff, the United States Securities and Exchange Commission ("SEC"), for its

Complaint against Defendant Sequential Brands Group, Inc. ("Sequential" or the "Company"),

alleges as follows:

## OVERVIEW

1.      This case arises from the failure of New York-based brand management company

Sequential to take into consideration clear, objective evidence of likely goodwill impairment,

which avoided and delayed a material write down to goodwill in the fourth quarter of 2016 and the first three quarters of 2017 (the "Relevant Period").

2.      Sequential conducted two internal calculations as of mid-December 2016 and year-end 2016 that showed that its goodwill was likely impaired.  These internal calculations used the ***same methodology*** that Sequential had disclosed in its SEC filings and had used in connection with its annual goodwill impairment testing just weeks before.  Sequential ignored this clear, objective, quantitative evidence of likely impairment.

3.      Instead, Sequential performed a strained, biased, and outcome-driven qualitative analysis—which omitted any consideration of its internal fair value calculations, as well as other significant negative developments in the Company's business—and unreasonably concluded that goodwill was ***not*** impaired.

4.      By avoiding an impairment to its goodwill in 2016, Sequential's financial statements and SEC filings materially understated its operating expenses and net loss and materially overstated its income from operations, goodwill, and total assets.  This created a false impression of its financial health and ability to execute on its business plan.  Sequential carried forward its material errors, resulting in material misstatements and omissions in Sequential's financial statements and SEC filings for the first three quarters of 2017.  Sequential belatedly impaired all of its goodwill—$304.1 million—in the fourth quarter of 2017.

5.      "Goodwill" is an intangible asset that is associated with the purchase of one company by another.  Specifically, goodwill is the portion of the purchase price that is higher than the sum of the net fair value of all of the assets purchased in the acquisition and the liabilities assumed in the process.  The value of a company's brand name, customer base, customer relations, employee relations, and proprietary technology represent some reasons why

goodwill exists.  "Impairment" is a permanent decline in the value of an intangible asset.  If there is impairment, then the difference between the intangible asset's carrying value (the amount at which it is carried on the company's books and records) and its fair value (the price that would be received to sell the asset in an arm's-length transaction) is written off.

6.      Public companies, like Sequential, are required to test goodwill for potential impairment at least once a year—and on an interim basis when certain indicators, or "triggering events," are present—and record any impairments.  Sequential unreasonably failed to do so.

7.      During the Relevant Period, Sequential—through the acts and omissions of its senior accounting and finance personnel, including its then-Chief Financial Officer ("CFO"), President and Interim CFO, and Vice President of Finance—unreasonably delayed and avoided an impairment to its goodwill by, among other deceptive conduct:

a.  Failing to conduct reasonable goodwill impairment testing that adequately incorporated all events and changes in circumstances known to Sequential's senior accounting and finance personnel in accordance with governing accounting standards.

b.  Engaging in biased, results-driven goodwill impairment testing with methodologies and evidence included or excluded based on the Company's ability to delay or avoid impairment through their use.

c.  Making false and misleading disclosures in Sequential's quarterly and annual reports on Forms 10-Q and 10-K concerning the Company's goodwill impairment testing policies, procedures, and practices, and failing to update disclosures to accurately reflect the Company's decision to no longer consider its disclosed

methodology (market capitalization, plus control premium), as a measure of fair value under governing accounting standards.

d.  Creating—without advance consultation with, or advice from, its independent auditor—a misleading memorandum documenting a qualitative goodwill impairment assessment that was designed to support the Company's fair value, and omitting the clear, objective evidence of impairment provided by the Company's internal fair value calculations and numerous negative developments in the Company's business.

e.  Withholding evidence of likely impairment from the auditor—namely, the results of the fair value calculations performed as of mid-December 2016 and year-end 2016—and instead presenting the auditor with a cherry-picked, biased, and results-driven qualitative assessment.

f.  Failing to conduct interim goodwill impairment testing and continuing to carry goodwill at over $300 million in the first three quarters of 2017, despite clear indicators of impairment, including the continued decline in Sequential's stock price, and instead changing from a market capitalization methodology to a Discounted Cash Flow methodology in the third quarter of 2017, which further delayed and avoided impairment.

8.  These and other acts and omissions by Sequential—by and through its senior accounting and finance personnel—enabled Sequential to improperly avoid and delay recording a goodwill impairment in the fourth quarter of 2016, as well as in the first three quarters of 2017.

9.      If Sequential had reasonably conducted goodwill impairment testing in the fourth quarter of 2016, then that test would have shown that Sequential's goodwill was impaired by **_over $100 million_**, a material amount.

10.      As a result of its unreasonable failure to properly conduct goodwill impairment testing in the fourth quarter of 2016 and to timely impair goodwill, Sequential's 2016 Form 10-K materially overstated goodwill and total assets on its balance sheet, understated operating expenses, overstated income from operations, and understated net loss.

11.      If Sequential had timely recorded the impairment to goodwill in the fourth quarter of 2016, then instead of reporting income from operations, Sequential would have reported a net loss.  Sequential's net loss for 2016 would have been 54 times larger than reported by the Company.  The goodwill impairment would have equaled 33 percent of recorded goodwill and 7 percent of total assets.

12.      Sequential's financial statements and SEC filings for the first three quarters of 2017 carried forward these errors, materially understating accumulated deficit and overstating goodwill, total assets, and stockholders' equity.

13.      Sequential did not tell investors or its auditor that it had conducted a quantitative analysis of fair value in the fourth quarter of 2016—using the same methodology as used in connection with its annual testing just weeks before—which showed that its carrying amount likely exceeded fair value.  Sequential further failed to disclose that **_not only_** did it not proceed to additional quantitative goodwill impairment testing, consistent with its goodwill disclosures, but that it **_also_** omitted the failing results of its fair value calculations from its strained and biased qualitative assessment.

14.     Sequential had in its possession facts and information tending to show that its statement that goodwill was not impaired was materially false and misleading.  Those facts were not known to investors or the independent auditor.

15.     Accordingly, Sequential's disclosures to the public in its SEC filings that goodwill was not impaired, as well as with respect to other key financial metrics, were materially false and misleading and did not fairly align with the information in Sequential's possession at the time.  Sequential's SEC filings misstated and omitted key facts about Sequential's inquiry into and knowledge about goodwill impairment, and a reasonable investor would have considered those facts material.

16.     During the Relevant Period, Sequential's internal accounting controls relating to the assessment of goodwill impairment were deficient in design and application, and failed to provide reasonable assurance that its financial statements were materially accurate and that it accounted for goodwill in compliance with governing accounting standards.  Sequential's internal accounting controls failures were particularly egregious, since intangible assets, including goodwill, were material to Sequential's financial statements and represented the Company's most significant assets and source of revenue generation.

17.     Sequential did not have adequate internal accounting controls or other systems in place to ensure that appropriate goodwill impairment assessments were conducted during interim periods between annual tests in accordance with governing accounting standards.  Although Sequential maintained an internal control providing for the preparation of memoranda "as triggering events occur," there was no control providing for a process to identify potential triggers, nor was there any requirement to document such assessments when no triggers were identified.  In light of these deficiencies, Sequential had no mechanism to ensure that interim

reviews were conducted properly, if at all, nor did it create any paper trail for senior management or the independent auditor to review the work, if any, that was done between annual tests.

18.     Sequential belatedly impaired all of its goodwill—$304.1 million—in the fourth quarter of 2017.  This $304.1 million impairment was not retrospective, however, and, to date, Sequential has failed to restate, otherwise correct, or disclose any of the accounting improprieties, deceptive conduct, material misstatements and omissions, and internal accounting control violations that are the subject of this Complaint.

19.     By engaging in the deceptive course of conduct described herein, Sequential violated the following antifraud, reporting, books and records, and internal accounting control provisions of the Securities Exchange Act of 1934 ("Exchange Act") and the Securities Act of 1933 ("Securities Act"):  Section 17(a)(3) of the Securities Act and Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder.

20.     Sequential will continue to violate the federal securities laws unless restrained or enjoined by this Court.

21.     The SEC therefore seeks a judgment against Sequential providing permanent injunctive relief and ordering Sequential to pay civil money penalties, as well as other appropriate and necessary equitable relief.

## JURISDICTION AND VENUE

22.     The SEC brings this action, and this Court has jurisdiction, pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa], and 28 U.S.C. § 1331.

23.     During the Relevant Period, Sequential was engaged in the offer and sale of securities.  In January 2017, Sequential registered securities pursuant to a registration statement

on Form S-8, which its then-CEO, then-CFO, and Board of Directors signed.  A Form S-8

registration statement is used when companies issue stock as part of an employee benefit plan,

including incentive plans, profit-sharing, bonuses, options, or similar opportunities.

"Employees" include anyone who serves a company in the capacity of an employee, general

partner, director, consultant, trustee, or advisor.

24.     Sequential's Form S-8 registration statement incorporated all of Sequential's

periodic reports filed with the SEC during the Relevant Period, including its 2016 annual report

on Form 10-K, its quarterly reports on Form 10-Q, and its current reports on Form 8-K

(including periodic earnings releases).  During the Relevant Period, Sequential issued restricted

stock units and performance stock units to employees and third-party consultants, as well as

restricted stock to directors, pursuant to employment or consulting agreements.

25.     Sequential, directly or indirectly, singly, or in concert with others, made use of the

means or instruments of transportation and communication in interstate commerce, or of the

mails, or of the facilities of a national securities exchange in connection with the acts,

transactions, or practices alleged in this Complaint.

26.     Venue is proper in this Court pursuant to Section 22(a) and 22(c) of the Securities

Act [15 U.S.C. § 77v(a), (c)] and Section 27(a) and (b) of the Exchange Act [15 U.S.C. §

78aa(a), (b)], because Sequential transacts business in this district, and certain of the acts,

practices, and courses of conduct constituting the violations alleged herein occurred within this

district.

## **DEFENDANT**

27.     **Sequential Brands Group, Inc. ("Sequential")** is a publicly traded company

incorporated in Delaware and headquartered in New York, New York.  Sequential has a class of

shares registered under Section 12(b) of the Exchange Act.  Sequential's common stock traded on the Nasdaq Capital Market under the symbol "SQBG" at all times during the Relevant Period, and continues to trade on the Nasdaq today.

## FACTUAL ALLEGATIONS

I.   **BACKGROUND**

### *Governing Accounting Principles, Standards, and Procedures*

28.      As a U.S. public company, Sequential is required by the SEC to comply with Generally Accepted Accounting Principles, or "GAAP," in compiling and filing its annual and interim financial statements with the SEC.

29.      GAAP is a series of authoritative standards (set out by policy boards, including the Financial Accounting Standards Board, or "FASB") that standardizes and regulates the definitions, assumptions, and methods used in accounting across industries, and seeks to ensure that a company's financial statements are complete, consistent, and comparable.  This makes it easier for investors to analyze and extract useful information from a company's financial statements and facilitates the comparison of financial information across different companies.

30.      FASB's Accounting Standards Codification ("ASC") is the current source of U.S. GAAP.

31.      Goodwill is an intangible asset that is associated with the purchase of a business by another.  Specifically, goodwill is the portion of the purchase price that is higher than the sum of the net fair value of all of the assets purchased in the acquisition and the liabilities assumed in the process.  The value of a brand name, customer base, customer relations, employee relations, and proprietary technology are some reasons why goodwill exists.

32.     Goodwill impairment is an accounting charge that companies record when goodwill's carrying amount on the financial statements exceeds its implied fair value.[1]  Goodwill impairment arises when there is deterioration in the capabilities of acquired assets to generate the cash flows anticipated at the time of acquisition and the fair value of the goodwill dips below its book value.

33.     Public companies are required to test goodwill for impairment at least annually, or on an interim basis when indicators, or "triggering events," are present, such as adverse changes in the business climate or market that might negatively impact the value of a reporting unit.

34.     GAAP requires goodwill impairment testing to be performed at the "reporting unit" level.  ASC 350-20-20 defines a reporting unit as an operating segment, or a segment that is one level below an operating segment (also referred to as a component).  An operating segment is defined by ASC 280-10-50 as a component of an enterprise that earns revenue and incurs expenses, of which discrete financial information is available.

35.     ASC 350, *Intangibles—Goodwill and Other*, addresses the measurement of goodwill subsequent to its acquisition, including testing for impairment to goodwill, which must be conducted at least annually.  ASC 350 also requires entities to conduct interim goodwill impairment testing when certain indicators, or "triggering events," are present, such as adverse changes in the business climate or market that might negatively affect the value of a reporting unit.  Interim goodwill impairment testing is therefore required if an event occurs or

---

[1]     "Fair value" is the price that two parties are willing to pay for an asset or liability, preferably in an active market.  To calculate the implied fair value of goodwill, assign the fair value of the reporting unit with which goodwill is associated to all of the assets and liabilities of that reporting unit.  The excess amount of the fair value of the reporting unit over the amounts assigned to its assets and liabilities is the implied fair value of the associated goodwill.  The fair value of the reporting unit is assumed to be the price that the company would receive if it were to sell the unit in an orderly transaction between market participants.

circumstances exist that indicate that it is more likely than not that a goodwill impairment

exists." *See* ASC 350-25-35-30.

36.    ASC 350 outlines a multi-step process for assessing whether goodwill is impaired.

During the Relevant Period, ASC 350 permitted companies to conduct a threshold qualitative

assessment of goodwill as a preliminary step (known as "Step 0") to evaluate whether or not the

carrying amount (book value) of a reporting unit was more likely than not greater than its fair

value.  If the fair value of the reporting unit was more likely than not greater than its carrying

amount, then no impairment was deemed to exist and no further assessment was necessary.  If

the carrying amount was more likely than not greater than fair value, however, then ASC 350 set

forth guidance for more rigorous quantitative testing (known as "Step 1").

37.    Alternatively, ASC 350 provided that a company could skip the Step 0 qualitative

assessment and instead proceed directly to a quantitative assessment of fair value (known as

"Step 1").  If a company's Step 1 test indicated that its carrying amount likely exceeded fair

value, then ASC 350 required the company to conduct further quantitative testing (known as

"Step 2") to measure the magnitude of the impairment to goodwill.  If the implied fair value of

goodwill was less than its carrying amount, then goodwill was considered to be impaired and the

goodwill on the financial statements must be adjusted downward, with the residue recognized as

an impairment loss.[2]

38.    ASC 350's qualitative Step 0 assessment was implemented by Accounting

Standards Update (ASU) 2011-08, whereas previous guidance required companies to rely solely

---

[2]    In 2017, Accounting Standards Update ("ASU") 2017-04 eliminated ASC 350's
Step 2 analysis and simplified the quantification of goodwill impairment in the event that a
company failed the Step 1 test.  Sequential adopted ASU 2017-04 during the first quarter of
2017.  *See* Q1 2017 Form 10-Q at 26.

on a quantitative assessment of fair value.  According to ASU 2011-08, this change was "intended to reduce complexity and costs by allowing an entity the option to make a qualitative evaluation about the likelihood of goodwill impairment to determine whether it should calculate the fair value of a reporting unit."

39.     Pursuant to ASC 350, goodwill is impaired when its carrying amount exceeds its implied fair value, as defined by ASC 820—*Fair Value Measurements and Disclosures*, which defines "fair value" as the price that would be received to sell an asset or to transfer a liability in an orderly transaction between market participants at the measurement date.

40.     Under ASC 820, companies are to maximize the use of relevant observable inputs (such as stock price in a public market) and minimize the use of unobservable inputs (such as management's subjective opinions).

41.     Pursuant to ASC 350-20-35-3C, relevant indicators of impairment during the Relevant Period included, at a minimum:

(a)  Macroeconomic conditions such as a deterioration in general economic conditions, limitations on accessing capital, fluctuations in foreign exchange rates, or other developments in equity and credit markets;

(b)  Industry and market considerations such as a deterioration in the environment in which an entity operates, an increased competitive environment, a decline in market-dependent multiples or metrics (consider in both absolute terms and relative to peers), a change in the market for an entity's products or services, or a regulatory or political development;

(c)  Cost factors such as increases in raw materials, labor, or other costs that have a negative effect on earnings and cash flows;

(d)  Overall financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods;

(e)  Other relevant entity-specific events such as changes in management, key personnel, strategy, or customers; contemplation of bankruptcy; or litigation;

(f)  Events affecting a reporting unit such as a change in the composition or carrying amount of its net assets, a more-likely-than-not expectation of selling or disposing all, or a portion, of a reporting unit, the testing for recoverability of a significant asset group within a reporting unit, or recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit; and

(g)  If applicable, a sustained decrease in share price (consider in both absolute terms and relative to peers).

42.     The guideline makes clear that this list is "not all-inclusive," and that "an entity shall consider other relevant events and circumstances that affect the fair value or carrying amount of a reporting unit in determining whether to perform the quantitative first step of the goodwill impairment test," *see* ASC 350-20-35-3F, and further provides that "[i]f an entity has a recent fair value calculation for a reporting unit, it also should include as a factor in its consideration the difference between the fair value and the carrying amount in reaching its conclusion about whether to perform the quantitative first step of the goodwill impairment test," *id.*

43.     In its 2016 Form 10-K, Sequential disclosed that it had a single reporting unit and tested for goodwill impairment annually on October 1 and between annual tests, if circumstances changed that more likely than not would reduce the fair value of the reporting unit below its

carrying amount.  It further stated that it would begin with a qualitative test or, alternatively, skip

the qualitative test and move directly to a two-step quantitative test in which the second step

would be pursued if the first step indicated that the estimated fair value of the reporting unit was

less than its carrying amount.

> In evaluating goodwill for impairment, the Company **first assesses qualitative factors** to determine whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount…If the Company bypasses the qualitative assessment, **or concludes that it is more likely than not that the fair value of a reporting unit is less than its carrying value**, it then performs a two-step goodwill impairment test to identify potential goodwill impairment and measure the amount of goodwill impairment to be recognized, if any.
>
> In the first step, the Company will compare the estimated fair value of the reporting unit with its carrying value.  **The Company has determined that it has a single reporting unit and considers its market capitalization** (calculated as total common shares outstanding multiplied by the common equity price per share, as adjusted for a control premium factor) **to represent its fair value.**
>
> If the estimated fair value of the reporting unit exceeds its carrying amount, no further analysis is needed.  **If, however, the estimated fair value of the reporting unit is less than its carrying amount, the Company will proceed to the second step and calculate the implied fair value of the reporting unit goodwill to determine whether any impairment is required.**

2016 Form 10-K at F-11 (emphasis added) (signed by then-CEO, then-CFO, and Board

of Directors); *id.* at 27.

44.     Importantly, the Company disclosed that, as a single reporting unit, **it considered**

**its market capitalization, as adjusted for a control premium, to represent its fair value.**

Sequential's status as a single reporting unit entity is significant, because it greatly simplifies

quantitative testing based on market capitalization.  Whereas quantitative valuations of larger

companies with multiple reporting units are necessarily a costly, complex analysis, single

reporting unit entities may utilize their publicly traded stock price as an objective indicator of

fair value for the whole company.  Sequential's disclosures did not describe any circumstance under which the Company might conduct a qualitative test *after* performing a quantitative test.

### Sequential's Business Model, Declining Stock Price, and Earnings Estimates

45.     Sequential owns and manages a portfolio of consumer brands and promotes, markets, and licenses those brands through retailers, wholesalers, and distributors in the United States and abroad.

46.     Sequential acquired consumer brands through acquisitions, which created substantial goodwill on its balance sheet.  During the Relevant Period, Sequential's indefinite-lived intangible assets, including goodwill, constituted the overwhelming majority of the Company's assets.  As of December 31, 2016, intangible assets, including goodwill, represented $1.3 billion, or 93 percent, of Sequential's total assets, and goodwill represented $307.7 million, or 21.4 percent, of Sequential's total assets.  *See* 2016 Form 10-K at 17.

47.     Throughout 2016 and 2017, Sequential's industry sector performed poorly.  As shown in the chart below, Sequential's stock price steadily declined during this period, beginning no later than mid-2015, and continuing through 2017.



48.     Sequential's projections of its future earnings and analysts' earnings estimates for Sequential likewise dropped during this period.  Analysts' reports to investors also predicted steady decline in the "price targets" for Sequential's stock —the price at which analysts projected the stock would be fairly valued.

49.     For example, in its earnings release reporting its first quarter financial results, furnished to the SEC as an exhibit to a Form 8-K signed by its then-CFO, Sequential estimated that its adjusted Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") for 2016 would be between $83 and $87 million.  This was just two months prior to Sequential's

acquisition of a significant consumer brand, which Sequential projected would materially improve its 2016 earnings.  *See* Form 8-K, filed May 5, 2016.

50.     By July 2016, however, despite the acquisition of the significant consumer brand, Sequential's estimated adjusted EBITDA for 2016 remained largely unchanged, at between $88 and $91 million.  See Form 8-K, filed Jul. 28, 2016 (signed by then-CFO).  When corrected to exclude the significant consumer brand, estimated adjusted EBITDA for 2016 had dropped by over 7 percent to $79 million.  By November 2016, Sequential's estimated adjusted EBITDA for 2016 had dropped back to between $83 and $88 million, see Form 8-K, filed Nov. 3, 2016 (signed by then-CFO), and, when corrected to exclude the significant brand, adjusted EBITDA predicted for 2016 had dropped by nearly 12 percent from Sequential's initial estimates to just $75 million.

51.     On November 3, 2016, Sequential issued its third quarter earnings release, furnished to the SEC as an exhibit to Form 8-K and signed by its then-CFO.  Six days later, on November 6, 2016, filed its Form 10-Q for the third quarter of 2016, signed by its then-CFO.

52.     In the weeks following Sequential's third quarter 2016 earnings release and Form 10-Q, Sequential's stock price continued to drop—trading over 25 percent lower than its price on October 1, 2016 annual goodwill impairment testing date.  By the end of 2016, Sequential's stock price had fallen to $4.68—over 40 percent lower than its price on October 1, 2016.

53.     In short, during the Relevant Period, goodwill formed a substantial percentage of Sequential's assets.  In light of its declining stock price and underlying earnings metrics, Sequential's failure to impair significantly enhanced the Company's apparent financial health and ability to execute on its business plan and turned a ***net loss*** into ***income***.

II.     **SEQUENTIAL UNREASONABLY UNDERTOOK A DECEPTIVE COURSE OF CONDUCT TO AVOID AND DELAY GOODWILL IMPAIRMENT**

54.     By October 1, 2016, Sequential was on notice that its stock price had been declining for over a year.  A sustained decrease in stock price is an indicator of impairment under ASC 350.  *See* ASC 350-20-35-3C.

55.     Sequential's stock price was a particularly important consideration in Sequential's goodwill impairment testing, since the Company's goodwill impairment testing policy, disclosed throughout 2016 in Sequential's quarterly and annual reports on Forms 10-Q and 10-K, expressly stated that Sequential considered its market capitalization (calculated as total common shares outstanding multiplied by the common equity price per share, as adjusted for a control premium factor) to represent its estimated fair value.

56.     In addition, Sequential's management, senior accounting and finance personnel, and Board of Directors were aware that the retail sector in which Sequential's licensees and brands operated was struggling.  Sequential received reports that significant retailers were experiencing declines in business directly affecting Sequential's licensees.  Sequential also was on notice of increases in accounts receivable collection issues.  In addition, one of Sequential's most significant licensees requested that Sequential provide it with relief from its contractual minimums.  Sequential also identified nearly $10 million in expenses from an acquired brand, which Sequential had not anticipated at the time of acquisition, less than 12 months before.

### *Sequential's Senior Accounting and Finance Personnel Understood Goodwill Impairment Testing and Accounting*

57.     Sequential's senior accounting and finance personnel were well-versed in goodwill impairment testing under ASC 350, because the Company's assets were

overwhelmingly indefinite-lived intangible assets requiring annual and interim impairment testing.

58.     Sequential's senior accounting and finance personnel understood ASC 350's requirement for annual impairment testing, as well as for interim assessments between annual tests.  The senior accounting and finance personnel also understood ASC 350's steps and the mechanics of a market capitalization methodology for the determination of fair value.  They further understood that a failure to pass a "Step 1" goodwill impairment test would require additional quantitative analysis under "Step 2."

### *Sequential's Annual Goodwill Impairment Testing for 2016*

59.     Sequential assessed its goodwill for impairment annually, as of October 1, 2016.

60.     In connection with its annual goodwill impairment testing, Sequential retained an external valuation consultant to conduct a quantitative assessment of the Company's fair value, using Sequential's market capitalization (number of shares of stock outstanding, times stock price), adjusted for a control premium factor.[3]

61.     On December 6, 2016, the external valuation consultant provided Sequential with a report, which showed that, using this quantitative methodology of market capitalization plus control premium, the Company passed the test and that Sequential's goodwill therefore was not impaired as of October 1, 2016.

62.     In its 2016 Form 10-K, Sequential reported, "The Company performed its annual impairment evaluation of its goodwill as of October 1, 2016.  As of December 31, 2016 and

---

[3]     A "control premium" represents the amount that a buyer would be willing to pay over the current market price of a publicly traded company to acquire a controlling share in that company.

2015, no impairment of goodwill has been identified." 2016 Form 10-K at F-30 (signed by then-CEO, then-CFO, and Board of Directors).

### Sequential Ignores Objective Evidence of Impairment
### in the Fourth Quarter of 2016

63.     Shortly after receiving the external valuation consultant's report, Sequential's then-CFO forwarded the report to the chair of Sequential's audit committee and the Company's independent auditor.

64.     On receipt, the audit committee chair asked the then-CFO, "Do we meet the test today?" At the time of the inquiry on December 14, 2016, Sequential's stock price had fallen an additional 37 percent in the two months that had passed since the October 1, 2016 annual goodwill testing date.

65.     In response to the audit committee chair's inquiry, and at the direction of the then-CFO, Sequential's senior accounting and finance personnel conducted an analysis to determine Sequential's valuation as of December 14, 2016, using the same quantitative methodology as used by the external valuation consultant in connection with Sequential's annual goodwill impairment testing, but applying Sequential's stock price as of December 14. This analysis showed that Sequential's estimated fair value had fallen below the Company's carrying amount by approximately *$63 million*, a material amount.

66.     A subsequent analysis conducted by Sequential's senior accounting and finance personnel at the direction of the then-CFO, and again using the same methodology as used in connection with Sequential's annual goodwill impairment testing, showed that, as of December 31, 2016, Sequential's estimated fair value was approximately *$96 million* below its carrying amount, an increase of over 50 percent from the calculation as of December 14.

67.     No one at Sequential shared these analyses with the Company's independent auditor or told the independent auditor that Sequential had performed two calculations of fair value as of December 14 and December 31, 2016, through which Sequential learned that the Company's carrying amount exceeded its fair value by approximately $63 million in mid-December and by approximately $96 million at year-end.

68.     As a result of these calculations by its senior accounting and finance personnel, Sequential knew, or was unreasonable in not knowing—no later than December 14, 2016—that it was "more likely than not that the fair value of [Sequential's single] reporting unit [was] less than its carrying amount."  2016 Form 10-K at 27.  Under ASC 350, Sequential could not reasonably ignore this objective, quantitative, observable evidence that goodwill was more likely than not impaired as of December 2016.  Sequential unreasonably violated GAAP and the federal securities laws by neither conducting a quantitative assessment to confirm the impairment and to determine the magnitude of the impairment, nor considering this objective evidence in a qualitative assessment.

### *Sequential Instead Undertakes a Strained and Biased Qualitative Assessment That Ignores Objective Evidence of Impairment*

69.     Despite the clear language of ASC 350, its SEC disclosures, and its internal accounting controls, policies, and procedures—and without consulting its independent auditor—Sequential ignored this objective evidence of impairment.  Instead, Sequential's senior accounting and finance personnel, under the direction and oversight of Sequential's then-CFO, conducted a subjective, qualitative assessment to conclude that the market was unfairly undervaluing Sequential and that the Company's goodwill was not impaired.

70.     In other words, although objective evidence in Sequential's possession as of December 14 and December 31, 2016 showed that it more likely than not was impaired,

Sequential undertook a qualitative assessment to answer the same exact question that had already been answered "YES"—*through objective, quantitative evidence*—"NO."

71.     Under the oversight of Sequential's then-CFO, Sequential's senior accounting and finance personnel operated on the understanding that if the Company passed goodwill impairment testing, then they could move on, but that if the Company was likely to fail, then "more work" needed to be done.

72.     Beginning in early February 2017, Sequential's senior accounting and finance personnel conducted and documented a qualitative analysis to "supplement" the Company's memorandum memorializing its annual goodwill impairment testing as of October 1, 2016 (the "Goodwill Memorandum").

73.     On February 3, 2017, the Vice President of Finance emailed the then-CFO, stating that the team would "work on some qualitative talking points *to support our company value* as it relates to goodwill at 12/31/16" and that the external valuation consultant had been engaged to gather quantitative facts "*to bolster our argument*."

74.     In internal email communications, Sequential's senior accounting and finance personnel showed concern that they might need to record a goodwill impairment.  For instance, on February 16, 2017, the Vice President of Finance emailed the then-CFO, stating, "[The independent auditor] did not seem concerned or think that we should have an impairment, *but that could change if/when they take a deeper look*."

75.     In connection with this qualitative analysis, Sequential's senior accounting and finance personnel cherry-picked the evidence most favorable to Sequential and ignored other ASC 350 factors that would have led to a conclusion that goodwill was likely impaired.  With respect to the continuous decline in Sequential's stock price, for example, the Vice President of

22

Finance stated, "***Our stance*** is that the ***drop in stock price does not constitute an impairment event*** that would necessitate an interim impairment test.  In order ***to take that stance***, we ***have to state that we believe an impairment is not more likely*** if we would perform that test."

76.     Sequential's senior accounting and finance personnel omitted from the memorandum  numerous other negative events and changes in the Company's business that pertained specifically to fair value, and were required, under ASC 350-20-35-3F, to be evaluated as potential indicators of impairment in the assessment of impairment under ASC 350.  For example:

a.  Retail shoe sales were trending downward.  Heading into the fourth quarter of 2016, the then-CFO sent the then-CEO a sales trend report from a major retailer, stating, "Some interesting and concerning trends here –- inventory for shoes continues to decline–down 51% from PY [prior year]."

b.  One of Sequential's key brands (referred to herein as "Brand A") was in decline.  In October 2016, the then-CFO received an analysis that reflected the significant negative impact of Brand A's business on Sequential's first through third quarter 2016 results.  The analysis showed that Brand A was reporting 30 percent EBITDA margins (in contrast to the 58 percent margins forecasted nine months previously at time of acquisition).  Brand A, together with another brand with 40 percent EBIDTA margins, reduced Sequential's overall EBITDA margins by 9 percent.

c.  Budgeted costs for 2017 for Brand A were substantially higher than anticipated.  In late October 2016, the then-CFO sent the then-CEO an analysis of the 2017 budget for Brand A, highlighting previously unanticipated incremental costs of over $13 million, and the loss of $1.1 million in revenue.

d.  Bad debts were increasing.  In October 2016, Sequential's Controller informed the then-CFO of an accounts receivable write-off of over $345,000, and an additional $200,000 accounts receivable reserve for potential future write-offs (one of which was a licensee bankruptcy).  This was the third addition to Sequential's reserves for bad debt in 2016.

e.  Key brands were declining.  In December 2016, the then-CFO, as part of periodic divisional reviews, was notified of significant declines in key brands:

(i)  Brand A's third quarter 2016 sales were down by 26 percent, and by 22 percent year to date.

(ii) A second brand's sales were down 12 percent, compared to the third quarter of the prior year, and by 7 percent year to date with major declines in one licensee;

(iii) A third brand's sales were down 18 percent, compared to the third quarter of the prior year, and by 12 percent year to date.

f.  Sequential's external valuation consultant issued a research report in December 2016, which included indicators that Sequential's fair value was declining.  The report noted that Sequential's Expected Value / Next Twelve Months (EV/NTM) EBITDA—a metric reflecting a measure of company value—had been dropping since at least 2014.

77.     Under the direction and oversight of Sequential's then-CFO, Sequential's senior accounting and finance personnel prepared four drafts of the Goodwill Memorandum.  None of the draft memoranda nor the final Goodwill Memorandum contained any mention of the results of the two market capitalization analyses Sequential conducted as of December 14 and 31, 2016,

which showed that using the same methodology as used in connection with Sequential's annual goodwill impairment testing, Sequential was likely impaired.

78.    On February 23, 2017, Sequential's senior accounting and finance personnel forwarded the Goodwill Memorandum to Sequential's independent auditor, more than two months after Sequential first learned of the likely impairment to goodwill.

79.    The Goodwill Memorandum sent by Sequential's senior accounting and finance personnel to the independent auditor did not mention the market capitalization analyses conducted by Sequential as of December 14 and December 31, 2016.  Nor did the then-CFO or anyone else at Sequential tell the independent auditor about these analyses, or that, as of year-end 2016, the Company's carrying amount exceeded its fair value by nearly *$100 million*.

80.    Sequential's conduct, by and through the actions and inactions of its senior accounting and finance personnel, was in breach of its duty of care and outside the broad range of reasonableness, because Sequential knew, or was unreasonable in not knowing, that goodwill was likely impaired as of mid-December 2016.

81.    If Sequential had conducted further quantitative impairment testing in December 2016 to determine the magnitude of the impairment, then that testing would have shown an impairment of at least $100 million, a material amount.  An impairment of this amount would have resulted in a material change to the Company's fourth quarter and 2016 annual financial statements and reported earnings set forth in the Company's Forms 8-K and 10-K.

82.    As a result of its failure to conduct additional quantitative goodwill impairment testing in the fourth quarter of 2016 and to timely impair goodwill, Sequential materially understated operating expenses and overstated income from operations by at least $100 million

and understated the reported net loss by at least $42 million in its 2016 Form 10-K.  Sequential understated its loss per share by $0.68.

83.     If Sequential had timely recorded the impairment to goodwill for the fourth quarter of 2016, then Sequential's reported net loss for 2016 would have been 54 times larger. The impairment would have equaled 33 percent of recorded goodwill and 7.0 percent of total assets.

84.     Sequential carried these errors forward into the first three quarters of 2017, materially understating accumulated deficit and overstating goodwill, total assets, and stockholders' equity in its financial statements and SEC filings.

## III.    SEQUENTIAL'S FINANCIAL STATEMENTS AND DISCLOSURES WERE MATERIALLY FALSE AND MISLEADING

85.     In its filings with the SEC for 2016 and the first three quarters of 2017—until it belatedly impaired $304.1 million of goodwill in the fourth quarter of 2017—Sequential unreasonably failed to correctly account for material impairments to goodwill, instead reporting goodwill of over $300 million in each quarter.

86.     Sequential's financial statements for 2016 contained several material accounting errors, including: (i) an overstatement of income from operations; (ii) an understatement of operating expenses; (iii) an understatement of net loss; (iv) an overstatement of goodwill; and (v) an overstatement of total assets.  Sequential's financial statements for the first three quarters of 2017 also contained several material accounting errors, including: (i) an overstatement of goodwill; (ii) an overstatement of total assets; (iii) an understatement of accumulated deficit; and (iv) an overstatement of stockholders' equity.

87.     There was no reasonable basis under GAAP for Sequential to have accounted for and reported goodwill and other key financial metrics in the manner in which it did.

26

***Material Misstatements and Omissions in Sequential's***
***2016 Financial Statements and SEC Filings***

88.    As a result of Sequential's unreasonable failure to take into consideration the results of its quantitative market capitalization analyses of fair value for the fourth quarter of 2016, Sequential's financial statements were materially inaccurate, and Sequential included false and misleading statements and omissions in its periodic reports filed with the SEC.  Sequential's financial statements for this period also contained several material accounting errors, including: (i) an overstatement of income from operations; (ii) an understatement of operating expenses; (iii) an understatement of net loss; (iv) an overstatement of goodwill; and (v) an overstatement of total assets.

89.    On March 2, 2017, Sequential announced its 2016 financial results in a press release, which it furnished to the SEC as an exhibit to a Form 8-K signed by its then-CFO.  On a non-GAAP basis, Sequential reported net income for the quarter ending December 31, 2016 of $7.3 million, or $0.12 per diluted share.  Sequential reported adjusted EBITDA for the fourth quarter of 2016 of $24.2 million.  Sequential reported that total revenue for the year-ended December 31, 2016 increased 76 percent to $155.5 million, compared to $88.3 million in the prior year.

90.    On a GAAP basis, Sequential reported net loss of $(0.8) million for the year-ended December 31, 2016, or $(0.01) per diluted share, compared to $(2.9) million, or $(0.07) per diluted share, in the prior year.  On a non-GAAP basis, Sequential reported net income for the year-ended December 31, 2016 of $21.0 million, or $0.33 per diluted share, compared to $20.6 million, or $0.48 per diluted share, in the prior year.  Sequential reported adjusted EBITDA for the year-ended December 31, 2016 of $83.1 million, compared to $53.4 million in the prior year.

91.     Sequential's reported financial results were false and misleading, because if over $100 million in goodwill had been impaired for the fourth quarter of 2016, it would have resulted in a material change to Sequential's annual audited financial statements and its results of operations reported on Forms 10-K and 8-K for the fourth quarter of 2016 and the full year 2016. If Sequential had properly impaired its goodwill, then:  (i) goodwill would have been reduced by over $100 million; (ii) Sequential would have taken a material charge against earnings; and (iii) Sequential's GAAP net loss would have been materially greater.  Given the importance placed by Sequential, analysts, and investors on meeting or beating earnings, as well as the importance of Sequential's intangible assets, including goodwill, to its appearance of financial health and ability to execute on its business plan, these were material misstatements.

92.     On March 14, 2017, Sequential issued its 2016 financial statements in its annual report, filed with the SEC on a Form 10-K, signed by Sequential's then-CEO, then-CFO, and Board of Directors.  Sequential's 2016 financial statements repeated the false financial metrics from the press release and reported: (i) $307.7 million of goodwill; and (ii) $1.434 billion in total assets as of December 31, 2016.

93.     Sequential's reported financial results were misleading, because if over $100 million goodwill had been impaired for the fourth quarter of 2016, then:  (i) goodwill would have been reduced by over $100 million; (ii) Sequential would have taken a material charge against earnings; and (iii) Sequential's GAAP net loss would have been materially greater.  Given the importance placed by Sequential, analysts, and investors on meeting or beating earnings, as well as the importance of Sequential's intangible assets, including goodwill, to its appearance of financial health and ability to execute on its business plan, these were material misstatements.

94.     Sequential's 2016 Form 10-K also stated that Sequential "considers its market capitalization (calculated as total common shares outstanding multiplied by the price per share, as adjusted for a control premium factor) to represent its estimated fair value," and that "[i]f … the estimated fair value of the reporting unit is less than its carrying amount, the Company will proceed to the second step and calculate the implied fair value of the reporting unit goodwill to determine whether any impairment is required." 2016 Form 10-K at F-11; *id.* at 27.

95.     In the fourth quarter of 2016, Sequential knew, or was unreasonable in not knowing, that the estimated fair value of the reporting unit was less than its carrying amount, using a market capitalization plus control premium methodology. At a minimum, Sequential should have factored this information into its qualitative analysis of goodwill impairment. It unreasonably failed to do so, instead conducting a biased and cherry-picked results-driven analysis. Alternatively, Sequential should have "proceed[ed] to the second step and calculate[d] the implied fair value of the reporting unit goodwill to determine whether any impairment [was] required." *Id.* Because any such analysis would have shown that goodwill was materially impaired, Sequential's disclosures were materially false and misleading.

96.     Sequential's SEC filings failed to disclose that Sequential had conducted objective market capitalization analyses for the fourth quarter of 2016, using the same methodology as used in connection with its annual testing, which showed that its carrying amount likely exceeded fair value. Sequential further failed to disclose that not only did it not proceed to additional quantitative goodwill impairment testing consistent with its goodwill disclosures, but it also omitted the market capitalization calculation from its strained and biased qualitative assessment. Sequential had in its possession facts and information tending to show

that its statement that goodwill was not impaired was wrong.  Investors did not know those facts and information.

97.     Accordingly, Sequential's disclosures to the public in its SEC filings that goodwill was not impaired were materially false and misleading and did not fairly align with the information in Sequential's possession at the time.  Sequential, by and through its senior accounting and finance personnel, knew or was unreasonable in not knowing that Sequential's SEC filings misstated and omitted key facts about Sequential's inquiry into and knowledge about goodwill impairment.  A reasonable investor would have considered those facts material.

### Material Misstatements and Omissions in Sequential's First and Second Quarter 2017 Financial Statements and SEC Filings

98.     During 2017, there were additional triggering events demonstrating that Sequential's goodwill was more likely than not impaired, including:

   a.   Sequential issued downward revised earnings guidance for a second time in a period of three months;

   b.   Sequential's stock price declined by another 16 percent;

   c.   A valuation performed by a third-party valuation consultant on behalf of a lender, shortly before Sequential filed its Form 10-Q for the second quarter of 2017 on June 30, 2017, showed that the fair value of Sequential's goodwill was declining; and

   d.   Sequential's Chief Executive Officer was removed.

99.     Because Sequential's carrying amount remained materially unchanged, Sequential knew, or was unreasonable in not knowing, that the Company's carrying amount likely exceeded its fair value and therefore that goodwill was impaired.

100.    Despite the presence of these indicators of impairment and the clear suggestion that goodwill was likely impaired, however, Sequential, by and through its senior accounting and finance personnel, unreasonably concluded that no interim impairment test was necessary.

101.    Instead, Sequential continued to carry over $300 million of goodwill on its financial statements as non-impaired, and carried forward the material error in its financial statements from the fourth quarter of 2016, resulting in material misstatements and omissions in Sequential's quarterly reports filed on Form 10-Q for the first three quarters of 2017, as well as the three quarterly earnings releases furnished on Form 8-K.  These material misstatements included: (i) an overstatement of goodwill; (ii) an overstatement of total assets; (iii) understatement of accumulated deficit; and (iv) an overstatement of stockholders' equity.

102.    On May 4, 2017, Sequential announced its first quarter 2017 financial results in a press release, which it furnished to the SEC as an exhibit to a Form 8-K signed by its then-CFO. Sequential reported goodwill of $307.7 million, total assets of $1.427 billion, accumulated deficit of $40.8 million, and total Sequential and subsidiaries stockholders' equity of $463.6 million.

103.    Sequential's reported financial results were misleading, because if over $100 million in goodwill had been impaired in for the fourth quarter of 2016, then: (i) goodwill would have been reduced by over $100 million; (ii) Sequential's total assets would have been reduced by over $100 million; (iii) Sequential's accumulated deficit would have been materially higher; and (iv) Sequential's stockholders' equity would have been materially lower.  Given the importance placed by Sequential, analysts, and investors on meeting or beating earnings, as well as the importance of Sequential's intangible assets, including goodwill, to its appearance of financial health and ability to execute on its business plan, these were material misstatements.

104.     On May 10, 2017, Sequential issued its first quarter 2017 financial statements in its quarterly report, filed with the SEC on a Form 10-Q, signed by its then-CFO.  Sequential's first quarter 2017 financial statements repeated the false financial metrics from the press release and reported: (i) $307.7 million of goodwill; (ii) $1.427 billion in total assets; (iii) accumulated deficit of $40.8 million; and (iv) total Sequential and subsidiaries stockholders' equity of $463.6 million as of March 31, 2017.

105.     Sequential's financial statements for first quarter 2017 were misleading, because if over $100 million in goodwill had been impaired for the fourth quarter of 2016, then (i) goodwill would have been reduced by over $100 million; (ii) Sequential's total assets would have been reduced by over $100 million; (iii) Sequential's accumulated deficit would have been increased by at least $42 million; and (iv) Sequential's stockholders' equity would have been materially lower.  Given the importance placed by Sequential, analysts, and investors on meeting or beating earnings, as well as the importance of Sequential's intangible assets, including goodwill, to its appearance of financial health and ability to execute on its business plan, these were material misstatements.

106.     Sequential's first quarter 2017 Form 10-Q also stated that Sequential "considers its market capitalization (calculated as total common shares outstanding multiplied by the common equity price per share, as adjusted for a control premium factor) to represent its fair value," and that "[i]f … the estimated fair value of the reporting unit is less than its carrying amount, the Company will recognize an impairment charge for the amount by which the carrying value exceeds the reporting unit's fair value."  Q1 2017 Form 10-Q at 10.

107.     In the first quarter of 2017, Sequential knew, or was unreasonable in not knowing, that in the fourth quarter of 2016, the estimated fair value of the reporting unit was less than its

carrying amount, using a market capitalization plus control premium methodology, and that Sequential's stock price had continued to decline in the first quarter of 2017.  Sequential *did not* "recognize an impairment charge for the amount by which the carrying value exceeds the reporting unit's fair value" in the first quarter of 2017.  *Id.*  Sequential's first quarter 2017 disclosures were materially false and misleading.

108.    On July 27, 2017, Sequential announced its second quarter 2017 financial results in a press release, which it furnished to the SEC as an exhibit to a Form 8-K signed by its President and Interim CFO.  Sequential reported goodwill of $304.1 million, total assets of $1.422 billion, accumulated deficit of $38.3 million, and total Sequential and subsidiaries stockholders' equity of $467.6 million.

109.    Sequential's reported financial results were misleading, because if over $100 million in goodwill had been impaired for the fourth quarter of 2016, then: (i) goodwill would have been reduced by over $100 million; (ii) Sequential's total assets would have been reduced by over $100 million; (iii) Sequential's accumulated deficit would have been increased by at least $42 million; and (iv) Sequential's stockholders' equity would have been materially lower.

110.    On August 9, 2017, Sequential issued its second quarter 2017 financial statements in its quarterly report, filed with the SEC on a Form 10-Q, signed by its then-CFO.  Sequential's second quarter 2017 financial statements repeated the false financial metrics from the press release and reported: (i) $304.1 million of goodwill; (ii) $1.422 billion in total assets; (iii) accumulated deficit of $38.3 million; and (iv) total Sequential and subsidiaries stockholders' equity of $467.6 million as of June 30, 2017.

111.    Sequential's financial statements for second quarter 2017 were misleading, because if over $100 million in goodwill had been impaired for the fourth quarter of 2016, then:

(i) goodwill would have been reduced by over $100 million; (ii) Sequential's total assets would have been reduced by over $100 million; (iii) Sequential's accumulated deficit would have been increased by at least $42 million; and (iv) Sequential's stockholders' equity would have been materially lower.  Given the importance placed by Sequential, analysts, and investors on meeting or beating earnings, as well as the importance of Sequential's intangible assets, including goodwill, to its appearance of financial health and ability to execute on its business plan, these were material misstatements.

112.    Sequential's second quarter 2017 Form 10-Q also stated that Sequential "considers its market capitalization (calculated as total common shares outstanding multiplied by the common equity price per share, as adjusted for a control premium factor) to represent its estimated fair value," and that "[i]f … the estimated fair value of the reporting unit is less than its carrying amount, the Company will recognize an impairment charge for the amount by which the carrying value exceeds the reporting unit's fair value."  Q2 2017 Form 10-Q at 10.

113.    In the second quarter 2017, Sequential knew, or was unreasonable in not knowing, that in the fourth quarter of 2016, the estimated fair value of the reporting unit was less than its carrying amount, using a market capitalization plus control premium methodology, and Sequential's stock price had largely continued to decline in the first and second quarters of 2017, without rebounding to pre-December 2016 levels.  Sequential *did not* "recognize an impairment charge for the amount by which the carrying value exceeds the reporting unit's fair value" in the second quarter of 2017.  *Id.*  Sequential's second quarter 2017 disclosures were materially false and misleading.

***Material Misstatements and Omissions in Sequential's Third Quarter 2017***
***Financial Statements and SEC Filings***

114.    Because Sequential's stock price had continued to decline, Sequential knew, or

was unreasonable in not knowing, that it likely would not pass its annual goodwill impairment

test as of the October 1, 2017 annual testing date using its disclosed market capitalization, plus

control premium, methodology.

115.    Instead of conducting goodwill impairment testing to confirm the impairment and

determine its magnitude, however, Sequential changed its goodwill impairment methodology.

116.    Sequential's senior accounting and finance personnel, under the supervision of

Sequential's President, who served as Interim CFO, worked with the external valuation

consultant to develop a valuation report using a new discounted cash flow ("DCF")

methodology, and to reconcile the results achieved using this methodology with the prior market

capitalization methodology.

117.    To bridge the gap between the DCF and prior market capitalization

methodologies, Sequential's management and senior accounting and finance personnel relied on

subjective opinions that the market undervalued the Company.

118.    Using the DCF methodology, Sequential concluded that goodwill was not

impaired in the third quarter of 2017.

119.    On November 9, 2017, Sequential announced its third quarter 2017 financial

results in a press release, which it furnished to the SEC as an exhibit to a Form 8-K signed by its

President and Interim CFO.  Sequential reported goodwill of $304.1 million, total assets of

$1.381 billion, accumulated deficit of $62.48 million, and total Sequential and subsidiaries

stockholders' equity of $443.73 million.

35

120.    Sequential's reported financial results were misleading, because if over $100 million in goodwill had been impaired for the fourth quarter of 2016, then: (i) goodwill would have been reduced by over $100 million; (ii) Sequential's total assets would have been reduced by over $100 million; (iii) Sequential's accumulated deficit would have been increased by at least $42 million; and (iv) Sequential's stockholders' equity would have been materially lower.

121.    On November 13, 2017, Sequential issued its third quarter 2017 financial statements in its quarterly report, filed with the SEC on a Form 10-Q, signed by its President and Interim CFO.  Sequential's third quarter 2017 financial statements repeated the false financial metrics from the press release and reported: (i) $304.1 million of goodwill; (ii) $1.381 billion in total assets; (iii) accumulated deficit of $62.48 million; and (iv) total Sequential and subsidiaries stockholders' equity of $443.73 million as of September 30, 2017.

122.    Sequential's financial statements for third quarter 2017 were misleading, because if over $100 million in goodwill had been impaired for the fourth quarter of 2016, then: (i) goodwill would have been reduced by over $100 million; (ii) Sequential's total assets would have been reduced by over $100 million; (iii) Sequential's accumulated deficit would have been increased by at least $42 million; and (iv) Sequential's stockholders' equity would have been materially lower.

123.    In its Form 10-Q for the third quarter of 2017, Sequential disclosed that:

During the quarter ended September 30, 2017, as a result of its qualitative assessment of the likelihood of goodwill impairment, the Company identified potential impairment indicators and determined that a quantitative assessment was necessary.  ***Fair value for the quantitative assessment was determined under an income approach using estimates of discounted future cash flows (the "DCF Method").***  The DCF Method relies on assumptions such as the Company's projected future earnings and appropriate discount rates.  ***The Company corroborated the results of the DCF Method by reconciling to within a reasonable range of its market capitalization (calculated as total common shares outstanding multiplied by the common equity price per share, as***

*adjusted for a control premium factor).*  Reconciling items identified included the benefit of the Company's *fully reserved tax assets for which the market capitalization may not be giving full value.*  Based on the results of the quantitative assessment, the Company determined goodwill was not impaired for the period ended September 30, 2017.

Q3 2017 Form 10-Q at 11 (emphasis added) (signed by President and Interim CFO); *see also id.* at 18.

124.    Sequential's third quarter 2017 disclosures were materially false and misleading, because a reasonable investor reviewing Sequential's third quarter 2017 goodwill disclosures would not know that: (i) Sequential's goodwill was impaired by over $100 million in the fourth quarter of 2016, but the Company did not impair goodwill at that time; (ii) there was a $300 million difference between the fair values calculated under the market capitalization and DCF methodologies for the third quarter of 2017; (iii) Sequential's reconciliation between the market capitalization and DCF methodologies relied heavily on the subjective opinions of management; (iv) the reconciliation was made up of two factors, only one of which was discussed in the goodwill disclosures; an item comprising $100 million—or one third—of the reconciliation amount, was excluded from the footnote; (v) the "fully reserved tax assets" referred to in the disclosure were, in fact, not fully reserved, but rather were a *calculated* tax amortization benefit; and (vi) if Sequential had not changed from a market capitalization analysis to a DCF analysis in the third quarter of 2017, it likely would not have passed its annual goodwill impairment test.

### *Sequential Belatedly Impairs $304.1 Million of Goodwill in the Fourth Quarter of 2017*

125.    In the fourth quarter of 2017, citing "the identification of impairment indicators during the quarter ended December 31, 2017," "the continued, sustained decline" in its stock price, and "the related decline in [its] market capitalization," Sequential recorded a non-cash

goodwill impairment charge of $304.1 million.  2017 Form 10-K at 17, 28, 30 (signed by then-CEO, President and Interim CFO, and Board of Directors); *see also id.* at F-33, F-34.

126.    If Sequential had applied the governing accounting standards in a reasonable manner, starting in the fourth quarter of 2016, then it would have recognized a material impairment to goodwill of over $100 million in the fourth quarter of 2016.  Conditions did not improve in the first three quarters of 2017, and goodwill, total assets, and stockholders' equity were materially overstated, and accumulated deficit was materially understated, on Sequential's balance sheet in each of those quarters.  Thus, Sequential also failed to act reasonably, when it did not recognize impairments to goodwill of at least $100 million in the first three quarters of 2017.

127.    Accordingly, Sequential's financial statements and SEC filings for 2016, the first quarter of 2017, the second quarter of 2017, and the third quarter 2017—until impairing $304.1 million of goodwill in the fourth quarter of 2017—contained material misstatements concerning its income statement and balance sheet, including its operating expenses, income from operations, net loss, goodwill, total assets, accumulated deficit, and stockholders' equity.

## IV.    SEQUENTIAL'S DEFICIENT INTERNAL ACCOUNTING CONTROLS

128.    During the Relevant Period, Sequential had in place one internal accounting control concerning goodwill impairment testing:

> **Control # PE-16:**  On an annual basis, or as triggering events occur during the year, the DAER [Director of Accounting and External Reporting] completes an impairment assessment of Goodwill and Intangible Asset accounts to determine if an impairment of the intangible asset has occurred.  In addition, a memo detailing the review is provided to the CFO and VP Finance review.  The CFO/VP Finance review includes discussion with the DAER of any noted triggering events, and the calculation of the respective impairment charge, as noted within the impairment memo.  All intangible asset impairments are recorded in the GL during the period in which the asset's carrying value is considered to have exceeded its fair value.

129.    This internal accounting control was not sufficient to provide reasonable assurance that Sequential would perform and record its interim and annual assessments of goodwill for impairment as necessary to permit preparation of financial statements in conformity with GAAP.

130.    During the Relevant Period, Sequential's senior accounting and finance personnel did not follow the protocol set forth in Control # PE-16 with respect to interim goodwill impairment testing.

131.    Sequential did not have clear, contemporaneous evidence and documentation to support its goodwill impairment conclusions.

132.    Sequential failed to implement internal accounting controls, policies, or procedures reasonably designed to identify potential indicators or triggers for impairment and to cause the Company to conduct appropriate interim goodwill impairment testing where, pursuant to ASC 350, indicators of impairment were present.  Sequential also failed to implement internal accounting controls, policies, or procedures reasonably designed to cause the Company to conduct appropriate impairment testing where, pursuant to ASC 350, it was more likely than not that the carrying amount of Sequential's reporting unit exceeded its fair value.

133.    There is no contemporaneous documentation showing that any individual at Sequential was monitoring indicators of impairment.  Moreover, Sequential did not have in place any internal accounting controls, policies, or procedures requiring any formal review or documentation, including documentation of the decision of the Company *not* to conduct additional impairment testing where it concluded no triggering events were present.

134.    Although Sequential maintained an internal control providing for the preparation of memoranda "as triggering events occur," there was no control providing for a process to

*identify* potential triggers, nor was there any requirement to ***document*** such assessments when no triggers were identified.

135.    Rather than engaging in systematic reviews for potential impairment indicators, Sequential instead relied heavily on senior executives' general knowledge of the business and undocumented discussions to provide the financial and operational information that went into the Company's testing.  Further, due to the poorly designed process and controls (including the lack of adequate documentation), it is impossible to determine whether particular triggering events were considered.

136.    In light of these deficiencies, Sequential had no mechanism to ensure that interim reviews were conducted properly, if at all, nor did it create any paper trail for senior management or the independent auditor to review the work (if any) that was done between annual tests.

137.    Sequential's absence of sufficient internal controls is demonstrated by the Company's unreasonable failure to take into consideration the results of its market capitalization analyses as of December 14 and December 31, 2016, and its unreasonable failure to identify its declining stock price and other negative factors enumerated above as indicators of impairment. Although a sustained decrease in share price is expressly identified as a potential indicator of impairment under ASC 350, Sequential's then-CFO provided sworn testimony that the "fundamentals of the business" were the most important consideration, and that a stock price drop—even a 75 percent drop— would not constitute a trigger requiring an interim impairment test.  The then-CFO further testified that even a decline of a full year would not be an indicator of impairment.

**VII.   THIS ACTION IS TIMELY FILED**

138.   The misconduct at issue in this Complaint occurred in 2016 and 2017, less than five years from the date of the filing of this Complaint.  This action is timely filed, including for purposes of 28 U.S.C. § 2462.

<u>CLAIMS FOR RELIEF</u>

**COUNT I**

**Violation of Section 17(a)(3) of the Securities Act**

**(Negligence-Based Fraud)**

139.   Paragraphs 1 through 138 are re-alleged and incorporated herein by reference.

140.   Sequential, in connection with the offer to sell or sale of securities and by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly and with negligence, engaged in any transaction, practice, or course of business which operated or would have operated as a fraud or deceit on purchasers of Sequential's securities.

141.   Among other misconduct, detailed above, during the Relevant Period, Sequential, by and through the acts and omissions of its senior accounting and finance personnel, failed to appropriately test its goodwill for impairment and timely record an impairment when required by GAAP.  Because Sequential failed to record a material impairment to goodwill as required by accounting standards, investors did not receive accurate information and were deceived.

142.   Sequential, by and through its senior accounting and finance personnel, engaged in a deceptive course of conduct by failing to reasonably carry out Sequential's impairment testing in accordance with GAAP, resulting in Sequential's disclosure and recordkeeping failures.  Sequential's conduct was unreasonable.  Sequential had deficient internal accounting controls and failed to ensure that interim impairment assessments were properly conducted,

documented, and reviewed throughout the year.  Sequential unreasonably ignored the December 2016 fair value determinations showing that goodwill was more likely than not impaired. Sequential continued to fail to impair goodwill in the first three quarters of 2017, given the facts known by its senior accounting and finance personnel.

143.    Sequential was aware that a fair value determination as of mid-December 2016 and again as of December 31, 2016 showed that it was more likely than not that goodwill was impaired.  Sequential ignored these facts, however, and did not perform additional quantitative testing or impair goodwill.

144.    This failure to impair goodwill as of year-end 2016 and the continued failures in the first three quarters of 2017 caused those periods' financial statements to be misstated.  These accounting errors resulted in misstatements in numerous public documents, including Sequential's 2016 annual report on Form 10-K, quarterly reports on Form 10-Q for the first three quarters of 2017, and earnings reports furnished on Form 8-K for these periods.  Moreover, as described above, these filings contained additional misstatements concerning the quantitative testing methodology that Sequential applied in impairment testing during these periods.

145.    During the Relevant Period, goodwill formed a substantial percentage of Sequential's assets.  Sequential's failure to timely impair goodwill significantly enhanced the Company's apparent financial health and reported earnings.

146.    By drafting, making, and disseminating repeated material misstatements in its current reports and earnings releases on Forms 8-K, quarterly reports on Form 10-Q, and annual report on Form 10-K, Sequential engaged in an transaction, practice, or course of business that operated as a fraud or deceit on purchasers of Sequential's securities.  Sequential's violations were not limited to an isolated accounting error or mistake.

147.     By engaging in the conduct described above, Sequential violated, and unless restrained and enjoined will again violate, Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## COUNT II

### Violations of Exchange Act Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13

### (Reporting Violations)

148.     Paragraphs 1 through 147 are re-alleged and incorporated herein by reference.

149.     Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.13a-1, 13a-11, and 13a-13] require issuers of securities registered with the SEC under Section 12 of the Exchange Act to file with the SEC annual, current, and quarterly reports containing all information required by law.  Rule 12b-20 [17 C.F.R. §§ 240.12b-20] requires that reports contain such further material information as may be necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

150.     Sequential filed with the Commission its annual report on Form 10-K for 2016 and quarterly reports on Forms 10-Q for the first, second, and third quarters of 2017 that contained material misstatements and omissions.

151.     As a result of its failure to timely impair goodwill in the fourth quarter of 2016, Sequential materially overstated goodwill by over $100 million on its balance sheet and understated the reported net loss  by at least $42 million in its 2016 Form 10-K.  Sequential understated its loss per share by $0.68.

152.     If Sequential had timely recorded the impairment to goodwill for the fourth quarter of 2016, then Sequential's reported net loss for 2016 would have been 54 times larger.

The impairment would have equaled 33 percent of recorded goodwill and 7 percent of total assets.  Sequential continued to materially understate accumulated deficit and overstate goodwill, total assets, and stockholders' equity in the first three quarters of 2017.

153.    Sequential also failed to update the disclosures in both the Summary of Significant Accounting Policies and the Goodwill footnotes to advise investors Sequential had abandoned the market capitalization approach to determine the fair value the Company in impairment testing.  Its quarterly disclosures on Form 10-Q continued to state that Sequential utilized the market capitalization approach, even though Sequential had determined it would no longer value the Company using that method.

154.    Accordingly, from the fourth quarter of 2016 until Sequential's fourth quarter of 2017 reporting of a $304.1 million impairment charge, the Company filed materially false, misleading, and inaccurate quarterly and year-end financial reports that indicated no impairment or risk of impairment of its goodwill.  As a result, Sequential violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13.

155.    By virtue of the foregoing, Sequential violated, and unless restrained and enjoined will again violate, Section 13(a) [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 13a-13] by issuing quarterly, annual and current reports that included materially misleading financial statements.

## COUNT III

### Violation of Section 13(b)(2)(A) of the Exchange Act

### (Books and Records Violation)

156.    Paragraphs 1 through 155 are re-alleged and incorporated herein by reference.

157.    Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] requires companies with a reporting obligation under Section 12 to make and keep books, records, and

accounts that in reasonable detail accurately and fairly reflect their transactions and the dispositions of their assets.

158.    As described above, from the fourth quarter of 2016 through the third quarter of 2017, Sequential improperly failed to record an impairment expense and impair goodwill.  As a result, during these periods, the Company's books, records and accounts did not accurately and fairly reflect impairment of goodwill and were false, misleading, and inaccurate in violation of Exchange Act Section 13(b)(2)(A).

159.    By virtue of the foregoing, Sequential violated, and unless restrained and enjoined will again violate, Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

**COUNT IV**

**Violation of Exchange Act Section 13(b)(2)(B)**

**(Internal Accounting Controls Violation)**

160.    Paragraphs 1 through 159 are re-alleged and incorporated herein by reference.

161.    Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. §78m(b)(2)(B)] requires reporting companies to devise and maintain a system of internal accounting controls sufficient to, among other things, provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

162.    Sequential failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that transactions were recorded as necessary to prepare financial statements in accordance with GAAP.

163.    Sequential's impairment assessment process lacked a consistent approach and repeatedly failed to consider key impairment triggers defined by the codified accounting

standard, such as industry environment, market/stock reaction, Company financial metrics, and the departure of the CEO.

164.    As described above, the Company's internal accounting controls surrounding reviews for interim impairment triggering events were insufficient to establish a reasonable process for identifying triggering events and failed to require the documentation of such process, unless triggers were identified.

165.    As a result, critical facts and circumstances that adversely affected goodwill were not addressed by Sequential's goodwill impairment assessment process or the memoranda documenting it.  These shortcomings rendered Sequential's interim goodwill impairment testing unreliable and hindered supervision and auditing of the process.

166.    By virtue of the foregoing, Sequential violated, and unless restrained and enjoined will again violate, Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court enter a Final Judgment:

A.    Finding that Sequential violated the federal securities laws alleged in Counts I through IV of the Complaint;

B.    Permanently restraining and enjoining Sequential, and all persons in active concert or participation with it, from violating the federal securities laws alleged in the Complaint;

C.    Ordering Sequential to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; and

D.      Granting such other and further equitable relief as the Court may deem just and proper.

## **JURY TRIAL DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the SEC demands a jury trial on all the issues so triable.


Dated: December 11, 2020                              Respectfully submitted,


                                                        By:     Sarah Heaton Concannon
                                                                (SDNY Bar No. SC-9111)
Of Counsel:                                                     Securities and Exchange Commission
                                                                100 F Street, N.E.
Richard E. Johnston                                             Washington, D.C. 20549
Ellen F. Bortz                                                  Telephone:  (202) 551-5361
                                                                Facsimile:  (202) 772-9292
                                                                Email:  ConcannonS@sec.gov

                                                                *Attorneys for Plaintiff Securities and*
                                                                *Exchange Commission*